COURT OF APPEALS
DECISION
DATED AND FILED

May 15, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP300-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2020CF145

IN COURT OF APPEALS
DISTRICT IV

---

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

 V.

ORRIS R. MITCHELL,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Portage County: THOMAS B. EAGON and PATRICIA BAKER, Judges. *Affirmed*.

Before Kloppenburg, P.J., Graham, and Nashold, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Orris Mitchell appeals his judgment of conviction and the order denying his motion for postconviction relief. On appeal, he argues that his trial counsel provided constitutionally ineffective assistance by eliciting and failing to object to the admission of other-acts and hearsay evidence. Most notably, Mitchell argues that counsel should have objected to the prosecutor's request to play police body camera footage, in which the victim and her housemate discussed Mitchell's criminal history. Although we assume that counsel was deficient in at least some respects, Mitchell has failed to show that there is a reasonable probability that he would not have been convicted without those errors. Therefore, we affirm.

## BACKGROUND

¶2 Mitchell was charged with two counts of felony bail jumping contrary to WIS. STAT. § 946.49(1)(b) (2023-24) based on his violations of a condition of his bond that required Mitchell to refrain from committing any new crimes.[1] The State alleged that Mitchell violated that condition in February and March 2020, when he threatened and then assaulted his ex-wife, Y.Z.[2] At that time, Mitchell was residing in Wisconsin and out on bond after having been criminally charged with second-degree sexual assault of a child, and Y.Z. was residing in Texas.

¶3 The charges stemmed from Y.Z.'s reports to Texas law enforcement. In late February, Y.Z. told Officer Paul Pearman that she had been receiving

---

[1] All references to the Wisconsin Statutes are to the 2023-24 version.

[2] To protect her privacy, we refer to the victim using initials that do not correspond to her real name. *See* WIS. STAT. RULE 809.86 (2023-24).

threatening messages from Mitchell. According to Y.Z., she received certain messages from Mitchell's Facebook account in December 2019. Then, after she blocked Mitchell on Facebook, she started to receive threatening text messages in February 2020. These messages came from numbers Y.Z. did not recognize, but she believed that they were from Mitchell based on their content and the style of texting used by the anonymous sender. At trial, Mitchell admitted that he sent the December 2019 Facebook messages, but denied that he sent the February 2020 text messages.

¶4 The messages from the Facebook account related to paperwork about Mitchell and Y.Z.'s son. They also related to "Kyle," who had been Mitchell's best friend, and who Y.Z. had dated after she and Mitchell divorced. One message from Mitchell's account read: "Hold on I received paperwork 2 sign wanted to let you know n tell u n Kyle I'm happy 4u." Another message read: "I can just sign it and fuck u over with our son." In response, Y.Z. told Mitchell to "leave [her] alone," and she eventually blocked him on Facebook.

¶5 The first series of text messages from an unidentified number came from the 715 area code. The first message read: "Keep running I no where u are." When Y.Z. asked who the sender was, the sender responded: "U no who this is got ur number from a bitch who hates u more than I do she wants u dead u can't track this number so nothin on me." Another message followed: "One day I will catch u n won't be able to run then. Going to enjoy taking wats mine back going to fuck u then grab ur throat n squeeze blue will look amazing on u u mite as well come back ain't no stopping me wats left 2 worry about." The final message in this series read: "u will pay for sending me to prison" and "In closer than u think bitch."

¶6    Y.Z. also received a second series of text messages from a different unidentified phone number, this time from the 361 area code.  The content of the messages implied that the sender was able to observe Y.Z. as she went about her daily activities in Texas, where she was living with an older couple with the surname Maday.  The first message read, in part:

> U got really pathetic if u think that old couple and Kyle are going 2 protect u from me I know where u are bitch saw u 2 fighting last night I told u that I was coming for u …  u will feel the pain for snitching on me divorce ain't nothin but a piece of paper bitch when I said my vows I meant it n just because I took what I wanted or knocked some sense into u don't mean you can run from vows we took when ur dead u will be free.

The message then made additional threats of physical and sexual violence and referenced a dog that Y.Z. had been walking, which the sender threatened to use for "target practice."  The final message in this series warned Y.Z. against going to the police: "U tell anyone about this n the tourcher will be worse I even smell a cop n I will cut out ur tonge bitch."

¶7    Officer Pearman forwarded copies of the Facebook and text messages to law enforcement in Wisconsin, and on February 27, 2020, an officer visited Mitchell at his residence in Marshfield.  The officer told Mitchell "to cease and desist speaking with [Y.Z.]" and served him with a warning letter, which provided that "any future stalking behavior" would likely result in his arrest. Mitchell denied that he had communicated with Y.Z.

¶8    Just over a week later, Y.Z. contacted Texas authorities for a second time.  She reported that on March 6, 2020, she encountered Mitchell outside of her residence in Texas, and he punched her in the face.  Y.Z. was eventually able to

escape and ran into her residence. When Y.Z. reported the assault the following day, officers took photographs of her injuries.

¶9 Mitchell was eventually arrested in Wisconsin and charged with two counts of felony bail jumping (one count for the threatening text messages and the second count for the physical assault). As elements of bail jumping, the State would have to prove that, on the dates in question: (1) Mitchell had a pending felony charge; (2) he had been released from custody on bond; and (3) he intentionally failed to comply with the terms of his bond by committing new crimes against Y.Z.[3] *See* WIS JI—CRIMINAL 1795.

¶10 Prior to trial, the parties entered into a stipulation that would satisfy the State's burden of proof with respect to the first two elements. Specifically, the parties stipulated that, at the time of the alleged bail jumping offenses, Mitchell had been charged with a felony, that he had been released from custody and was out on bond, and that he was subject to bond conditions. The objective of this stipulation was to prevent the jury from learning that the prior charges were for an alleged sexual assault of a child.

¶11 With the stipulation in place, the sole issue for trial was whether Mitchell "intentionally fail[ed] to comply with the terms of his … bond" by sending threatening messages to and assaulting Y.Z. *See* WIS. STAT. § 946.49(1)(b).

---

[3] The crimes that Mitchell allegedly committed were both violations of Texas law. Specifically, the State alleged that Mitchell violated TEXAS PENAL CODE ANN. § 22.01(a)(2) ("A person commits an offense if the person: … intentionally or knowingly threatens another with imminent bodily injury, including the person's spouse….") and TEXAS PENAL CODE ANN. § 22.01(a)(1) ("A person commits an offense if the person: … intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse….").

¶12    A jury trial was held in December 2021.  The State's theory of the case can be summarized as follows.  Y.Z. moved to Texas to get away from Mitchell while he was in jail on an unrelated felony charge (that is, the child sexual assault charge, which the jury was not supposed to learn about).  When Mitchell was eventually released on bond in December 2019, he was angry with Y.Z. for reasons that included their divorce, Y.Z.'s relationship with Kyle, and Mitchell's belief that Y.Z. had cooperated with law enforcement, which resulted in the prior charge and Mitchell's confinement in jail.  Mitchell began to message Y.Z. on Facebook, and after Y.Z. blocked him, he began to use a messaging application that allowed him to disguise his identity.  Although the messages came from an anonymous phone number that was not associated with Mitchell or any other sender, Y.Z. identified Mitchell as the sender of the messages based on their content.  After Y.Z. reported the threatening messages to law enforcement, Mitchell traveled to Texas and assaulted Y.Z.

¶13    Although the defense spent some time highlighting minor gaps in the State's case, its main focus was to establish that Mitchell had an "alibi" witness who would place him in Wisconsin at the time that both crimes were committed. The assault undisputedly occurred in Texas, and counsel theorized that the content of the threatening text messages suggested that the sender must have been in Texas and able to observe Y.Z. at her Texas residence.[4]  When Mitchell testified, he denied that he had sent the anonymous messages or traveled out of the State of Wisconsin, and he testified that he did not know how to drive and was unable to

---

[4] Counsel specifically pointed to the message where the sender described seeing Y.Z. "fighting" with someone, which was consistent with Y.Z.'s testimony that she had fought with one of her housemates the night before receiving that message.

follow directions. Counsel argued that Mitchell would not have been able to travel to or locate Y.Z.'s residence in Texas; and that Mitchell's cousin placed him in Marshfield, Wisconsin at all relevant periods.

¶14 Despite attempts to prevent the jury from learning about the nature of Mitchell's sexual assault charge, that information came out at trial. Most notably, this was in response to questions asked during trial counsel's cross-examination of Officer Pearman, when the State presented body camera footage of Pearman's initial interview with Y.Z. and her housemate, Carl Maday. During that video footage, both Y.Z. and Maday made various statements about Mitchell's criminal history. Y.Z. stated that Mitchell "got nailed with" a "girl," and had been charged with and was out on bond for "aggravated sexual assault." For his part, Maday stated that Mitchell had been "convicted of a domestic battery, assault, rape on other individuals" and "he is on the run because he has got warrants." At one point in the video, Pearman asked if Mitchell was a drug user, and Y.Z. stated that she did not know whether he was now, but "he used to be."

¶15 Mitchell's trial counsel did not object to the State's request to play the video, nor did counsel object to any of its contents. However, after the video was played, the circuit court, on its own initiative, read a curative instruction to the jury. Specifically, the court stated:

> During the course of the video, there were statements made regarding potential possible charges that the defendant faced and other conduct. Specifically, statements were made that the defendant had been charged with a sexual assault, that he had used drugs in the past, and there were warrants for him. You may not consider these statements to conclude that the defendant has a certain character or a certain character trait and that the defendant acted in conformity with that trait or character with respect to the offense charged here, the bail jumping charge. It's not evidence with regard to that charge.

¶16    The jury was provided additional information about Mitchell's history of violence and the nature of the prior charge during Y.Z.'s testimony. She testified, among other things, that she had given her son up for adoption "[b]ecause it was the only way to keep him safe" from Mitchell, who was "making threats towards" Y.Z. and "would not leave [her] alone." Y.Z. also testified that Maday encouraged her to take his dog "for protection" from Mitchell whenever Y.Z. left the house. Finally, Y.Z. testified that she had been "contacted by a[] [Wisconsin] officer regarding [Mitchell's] rape case," and she implied that she may have seen inculpatory evidence on Mitchell's phone. We provide additional information about the evidence and arguments at trial as needed in the discussion below.

¶17    The jury found Mitchell guilty of both counts of bail jumping. Mitchell moved for postconviction relief alleging ineffective assistance of trial counsel. He argued that trial counsel was ineffective for failing to object to inadmissible evidence elicited during the direct examination of Pearman and Y.Z.; for eliciting other-acts testimony during Pearman's cross-examination; and for failing to object to the admission of Pearman's body camera footage, which revealed inadmissible other-acts evidence and violated Mitchell's right to confront Maday, who was effectively a witness against him.

¶18    The circuit court held a *Machner* hearing, and much of the hearing focused on counsel's failure to object to the body camera footage.[5] Trial counsel

---

[5] *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979). A *Machner* hearing is "[t]he evidentiary hearing to evaluate counsel's effectiveness, which includes counsel's testimony to explain [counsel's] handling of the case." *State v. Balliette*, 2011 WI 79, ¶31, 336 Wis. 2d 358, 805 N.W.2d 334.

acknowledged that he did not have a strategic reason for not objecting to the video. Specifically, he testified: "I simply wasn't thinking. I was—basically, I was focused—in this case, I was so sure that the witnesses were going to [place Mitchell] in Marshfield, I didn't think [the contents of the video] would matter."

¶19 The circuit court denied Mitchell's postconviction motion. The court acknowledged that "there were issues in the trial." However, it reasoned that "there is a high likelihood that[,] even with[out] the errors made by [trial counsel], the outcome of this criminal proceeding would have been exactly the same." Mitchell appeals.

## DISCUSSION

¶20 A criminal defendant is guaranteed the right to the assistance of counsel by the United States Constitution, *see* U.S. CONST. amend. VI, and the Wisconsin Constitution, *see* WIS. CONST. art. I, § 7. *State v. Klessig*, 211 Wis. 2d 194, 201-02, 564 N.W.2d 716 (1997). "[T]he right to counsel is the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (citation omitted). To prevail on a claim of ineffective assistance of counsel, a defendant has the burden to prove that counsel's performance was deficient, and that the deficiency prejudiced the defendant. *Id.* at 688. The defendant must satisfy both prongs of the test—if the defendant fails to satisfy either one of the prongs, we need not address the other. *State v. Elm*, 201 Wis. 2d 452, 462, 549 N.W.2d 471 (Ct. App. 1996).

¶21 Mitchell argues that trial counsel was ineffective because he elicited and failed to object to improper video evidence and testimony from Pearman and Y.Z., and that the cumulative effect of this evidence was "extraordinarily prejudicial." Mitchell's arguments are founded in large part on WIS. STAT.

§ 904.04(2), which provides that "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith." *See also* **State v. Sullivan**, 216 Wis. 2d 768, 772-73, 576 N.W.2d 30 (setting forth a three-part analysis, which culminates in a determination of whether the probative value of the other-acts evidence, if any, is substantially outweighed by the danger of unfair prejudice to the defendant). As Mitchell argues, counsel's failure to guard against the admission of irrelevant and prejudicial statements in the video, as well as counsel's failure to object to the other statements about Mitchell's character and criminal history "completely obliterated the utility of Mitchell's stipulation to the first two elements of felony bail jumping, which was done for the purpose of keeping the jury from learning about Mitchell's pending sexual assault case." Likewise, Mitchell also contends that the admission of the video evidence violated the Sixth Amendment's Confrontation Clause because it allowed the jury to hear testimonial statements from Maday, Y.Z.'s housemate who did not testify at trial and was thus not available for cross-examination. Finally, Mitchell argues that counsel was ineffective for not objecting on hearsay grounds to certain portions of Pearman's testimony, in which he recounted statements that Y.Z. made to him in the course of the investigation.

¶22 Mitchell persuasively argues that counsel was deficient in at least some of these respects. In particular, we assume that counsel should have objected to the other-acts evidence about Mitchell's criminal history, and about his history of domestic violence and drug use. We further assume that, if counsel had objected or taken other steps to prevent the jury from hearing this evidence, the objections would have been sustained, and the jury would not have heard that Mitchell was out on bond for aggravated sexual assault of a child, that he had been

convicted of domestic battery, assault, and rape of other individuals, or that he used to be a drug user.[6]

¶23    However, for reasons we now explain, Mitchell has not persuaded us that he was prejudiced by trial counsel's errors. To establish prejudice, a defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* It is certainly possible that the improper other-acts evidence could have influenced at least some of the jurors in their deliberations, despite the circuit court's attempt to mitigate that risk with a curative instruction. Yet, our analysis of prejudice also considers the strength of the evidence that was properly admitted during the trial. *See id.* at 695-96. Here, given the strength of the admissible evidence and the collapse of Mitchell's alibi defense, we are not persuaded that there is a reasonable probability that the verdict would have been different if the jury had not learned about the pending sexual assault charges and other allegations.

¶24    We begin with the first bail jumping charge, which addressed the threatening text messages. Screenshots of those messages were presented to the

---

[6] Mitchell's argument about hearsay is, in our view, less persuasive. It is true that Pearman's testimony referenced out-of-court statements that Y.Z. made during the course of Pearman's investigation. However, it is likely that the court could have overruled any objection on the ground that the statements were not offered "to prove the truth of the matter asserted," but to explain Pearman's subsequent investigative activities. *See* WIS. STAT. § 908.01(3); *see also* *Jones v. Basinger*, 635 F.3d 1030, 1045 (7th Cir. 2011) (an out of court statement may not be hearsay if it "is offered into evidence 'as an explanation of why the subsequent investigation proceeded as it did'" (citation omitted)). In any event, Pearman's testimony adds little to an analysis of cumulative prejudice given that the jury heard these same statements directly from Y.Z. when she testified at trial.

jury and properly admitted at trial, and the sole question was whether it was Mitchell or someone else who sent those messages to Y.Z.

¶25 There was testimony by a Wisconsin police officer about his investigation into the unidentified phone numbers from which the text messages were purportedly sent. Specifically, the officer testified that he attempted to "track down" the numbers to find out if they belonged to any particular individual. The officer's investigation showed that "there was no information tied to either of the [phone] numbers," and this led the officer to conclude that the phone numbers had been "randomly generated" by an app. The officer testified that in the course of his investigation, he learned that apps like this are "readily available" to the public, and they allow individuals to "generate a different number" to send messages so "it looks like … it comes from a different number not connected to [the sender's] phone."

¶26 Both the content of the text messages and the grammar and spelling provided a strong link to Mitchell. Regarding content, the messages specifically addressed central aspects of Y.Z.'s marriage to and divorce from Mitchell. For example, the sender told Y.Z. that divorce was "nothin but a piece of paper," that she could not run from the "vows we took," that the sender intended to "tak[e] wats mine," and that Y.Z. "mite as well come back." The messages also addressed Y.Z.'s relationship with Kyle, who had been Mitchell's best friend, and the sender's belief that Y.Z. sent the sender "to prison" and would "pay" for doing that. The focus on Y.Z. and Mitchell's relationship, and on Y.Z.'s relationship with Kyle, was consistent with the Facebook messages that Mitchell admitted to having sent. Y.Z. testified that she knew that the text messages came from Mitchell because "he's the only one who's messaged me anything like that."

¶27    The text messages also matched Mitchell's manner and style of texting. The similarity would have been apparent to the jury based on Mitchell's Facebook messages, in which he also used the letter "u" for the word "you," the letter "n" for the word "and," and the number 2 for the word "to." The link to Mitchell also would have been underscored by testimony from defense witnesses. The messages from the unidentified numbers contained several misspelled words, which was consistent with Mitchell's testimony that he does not write very well, and his mother's testimony that some of the misspellings in the messages were consistent with how Mitchell might spell the words.

¶28    Mitchell was the only plausible author of this content, unless someone was impersonating him. The defense did not develop a compelling argument at trial that someone sent these messages to Y.Z. while pretending to be Mitchell. Nor did the defense effectively rebut the overwhelming evidence that pointed to Mitchell as the sender. We conclude that there is no reasonable probability that Mitchell would not have been convicted, had the jury not learned about Mitchell's criminal history.

¶29    So too on the second bail jumping charge, which addressed the physical assault at Y.Z.'s residence in Texas. On that charge, Y.Z. described encountering Mitchell outside her residence and being hit in the face, which was consistent with the photographs of her face that were entered into evidence. Y.Z. testified that there was "no question in her mind" that her assailant was Mitchell, and Y.Z. would have been in a position to identify Mitchell based on their relationship of many years. The defense did not develop any significant evidence to suggest that Y.Z. was fabricating the allegations, apart from Mitchell's purported alibi defense.

¶30    As for the alibi, that defense fell apart at trial. Mitchell's alibi witness was his cousin, Madison Kundo, who testified that Mitchell stayed at her Marshfield residence every night during the relevant time period. Kundo also testified that she and Mitchell visited Kundo's grandmother in the hospital on March 6, 2020, the day that Y.Z. was assaulted in Texas. However, this testimony was undermined by Kundo's mother and grandmother, who both testified about Kundo's character of untruthfulness. Kundo's mother testified that, in her view, Kundo was a "pathological liar," and Kundo's grandmother testified that Kundo "had a problem lying at times." The grandmother further testified that she did not remember Mitchell visiting her in the hospital, and that she told Kundo that she was "not going to lie for her" by saying that Mitchell was present.

¶31    What remained of the defense was Mitchell's testimony, as well as his mother's, that Mitchell did not know how to drive and could not have found his way to Y.Z.'s residence. However, this testimony was disputed by Y.Z., who testified that Mitchell did not have a driver's license, but she and other relatives taught Mitchell how to drive around 2014, and by Pearman, who testified that Y.Z.'s residence was "not hard to find at all."

¶32    In sum, considering the totality of admissible evidence presented at trial, our confidence in the outcome is not undermined, and we are not persuaded that there is a reasonable probability that the jury would have returned a different verdict if it had not been presented with the other-acts evidence. We therefore conclude that Mitchell has failed to show that he was prejudiced by trial counsel's errors.

## CONCLUSION

¶33 For the reasons explained above, we conclude that the circuit court did not err when it denied Mitchell's postconviction motion for a new trial.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.